UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PACIFICORP, an Oregon business corporation,<br><br>                      Plaintiff,<br><br>         v.<br><br>LAURA WATSON, in her official capacity as Director of the Washington State Department of Ecology,<br><br>                      Defendant. | Case No. 3:23-cv-06155-TMC<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING DEFENDANT'S MOTION TO DISMISS |

## I.    INTRODUCTION

Plaintiff PacifiCorp owns and operates a gas-fired electric power plant in Chehalis, Washington. The emissions generated by the Chehalis plant make PacifiCorp a "covered entity" under Washington's Climate Commitment Act (the "CCA"), which requires covered entities to buy allowances at auction for each metric ton of carbon dioxide emissions they generate. The CCA caps overall carbon emissions in the state, and the number of allowances available for purchase decreases over time, using market pressure to encourage investment in reducing emissions.

PacifiCorp is an electric utility that serves customers in six states, including Washington. The electricity that PacifiCorp sells to Washington customers is governed by an earlier Washington statute, the Clean Energy Transformation Act ("CETA"). Unlike the CCA's market-based approach to reducing emissions, CETA imposes a mandate: it requires all power sold to Washington consumers to be decarbonized by 2045. Because electric utilities in Washington are already subject to CETA's decarbonization mandate, the CCA provides them with "no-cost" allowances rather than requiring them to buy allowances at auction. The no-cost allowances phase out by 2045 once CETA's requirements are in full effect.

PacifiCorp receives these no-cost allowances for emissions generated by its Chehalis plant that serve its Washington utility customers. It must buy allowances, however, for emissions generated in Chehalis used to serve customers in other states—emissions that are not covered by CETA's decarbonization schedule. PacifiCorp contends that this difference in treatment of in-state and exported electricity violates the dormant Commerce Clause of the United States Constitution. It seeks a preliminary injunction ordering Defendant Laura Watson, who administers the CCA as the Director of the Washington Department of Ecology ("Ecology"), to either issue no-cost allowances to PacifiCorp for electricity generated for export or exempt PacifiCorp from purchasing allowances at all.

But the starting point for a successful dormant Commerce Clause challenge is "a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997). The electricity PacifiCorp generates to send out of state is not substantially similar to the electricity it sells in Washington because the exported energy is not covered by CETA. Accepting PacifiCorp's argument would elevate the energy it produces in Washington but then sends out of state above Washington's entire regulatory framework for reducing carbon emissions: it would be exempt from both the decarbonization mandate of CETA *and* the

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING DEFENDANT'S MOTION TO DISMISS - 2

purchase of allowances under the CCA. The dormant Commerce Clause does not require this result, and PacifiCorp's arguments fail as a matter of law. For this reason, and as explained further below, the Court GRANTS Defendant Watson's motion to dismiss (Dkt. 23) and DISMISSES the case. PacifiCorp's motion for a preliminary injunction (Dkt. 17) is DENIED as moot.

## II.    BACKGROUND

### A.    Washington's 2019 Clean Energy Transformation Act

In 2019, the Washington Legislature enacted CETA to "address the impacts of climate change by leading the transition to a clean energy economy." RCW 19.405.010. CETA mandates that all retail electricity sold to Washington customers be greenhouse gas neutral by 2030. RCW 19.405.040(1). By 2045, utilities must sell electricity generated entirely by non-emitting and renewable sources. RCW 19.405.050(1). Utilities are expected to meet this timeline by investing in greater efficiency, renewable energy infrastructure, and other energy transformation projects. *See* RCW 19.405.040(1)(a), (b). Because CETA applies only to electricity sold to Washington customers, it does not cover electricity generated within Washington but sold out of state.

Even before the decarbonization deadlines occur, the burden of CETA compliance is not insignificant. For example, beginning in October 2021 and every four years thereafter, each electric utility must file with the Washington Utilities and Transportation Commission a "clean energy implementation plan" that "describes the utility's plan for making progress toward meeting the clean energy transformation standards." WAC 480-100-640(1). The plan must be updated biennially and include detailed information about how the utility will set targets and make progress toward meeting CETA's requirements. *See* WAC 480-100-640(2)–(7). PacifiCorp itself has been involved in several proceedings before the Utilities and Transportation

Commission related to its CETA compliance efforts and the sufficiency of its clean energy implementation plan. *See, e.g.*, *In the Matter of the Petition of PacifiCorp d/b/a Pac. Power & Light Co., Petitioner, Seeking Exemption from the Provisions of WAC 480-100-605, No. 1*, 2021 WL 5961519, at *3 (Wash. U.T.C. Dec. 13, 2021); *In the Matter of PacifiCorp, d/b/a Pac. Power & Light Company's Clean Energy Implementation Plan*, No. UE-210829, 2023 WL 7181840 (Wash. U.T.C. Sept. 22, 2023). While this case has been pending, the Commission entered an order finding that PacifiCorp's biennial update to its clean energy implementation plan "does not at this time show meaningful progress towards meeting CETA standards" and setting the matter for adjudication. *Washington Utilities & Transp. Comm'n, Complainant, v. PacifiCorp d/b/a Pac. Power & Light Co., Respondent*, 09, 2024 WL 1364108, at *5 (Wash. U.T.C. Mar. 25, 2024). The Court takes judicial notice of these administrative proceedings not for the substance of the decisions or their underlying facts, but merely as examples of how CETA compliance is enforced. Fed. R. Evid. 201; *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) ("Courts may take judicial notice of some public records, including the records and reports of administrative bodies." (internal quotation marks and citation omitted)).

**B.      Washington's 2021 Climate Commitment Act**

Two years after CETA, in 2021, the Legislature enacted the CCA to further reduce greenhouse gas emissions in Washington by establishing a "cap and invest program." RCW 70A.65.005, .010(58), .060–.080. The CCA directs Ecology to set an annual cap on greenhouse gas emissions by Washington's largest emitters, known as "covered entities." RCW 70A.65.060. The cap applies to most entities that generated or engaged in certain activities associated with at least 25,000 metric tons of "carbon dioxide equivalent" emissions for any year between 2015 and 2019. RCW 70A.65.080(1). PacifiCorp is a covered entity because of the emissions generated by its Chehalis power plant. *See* Dkt. 11 ¶¶ 2–3, 5, 11.

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING
DEFENDANT'S MOTION TO DISMISS - 4

The CCA requires covered entities such as PacifiCorp to have "allowances" for each metric ton of greenhouse gases they emit. RCW 70A.65.010(1) (defining "allowance" as "an authorization to emit up to one metric ton of carbon dioxide equivalent"). A covered entity may only emit as much greenhouse gas as it has allowances for and if it exceeds that amount, it must either submit four allowances for every one allowance missing or face penalties of up to $10,000 per day for each violation. RCW 70A.65.200. Each year, Ecology will reduce the total number of allowances available, thereby "capping" the amount of greenhouse gases that covered entities may collectively emit. RCW 70A.65.070(2).

Most covered entities obtain allowances by purchasing them at auctions conducted by Ecology. RCW 70A.65.100. The proceeds from the auctions are used to invest in climate change mitigation and environmental justice projects (the "invest" portion of "cap and invest"). RCW 70A.65.100(7), .230.

Some covered entities receive certain allowances for free, which the CCA calls "no-cost allowances." *See* RCW 70A.65.110–130. This includes electric utilities such as PacifiCorp.[1] *See* Dkt. 11 ¶¶ 5, 8, 11. In relevant part, the CCA reads:

> The legislature intends by this section to allow all consumer-owned electric utilities and investor-owned electric utilities *subject to the requirements of chapter 19.405 RCW, the Washington clean energy transformation act*, to be eligible for allowance allocation as provided in this section in order to mitigate the cost burden of the program on electricity customers.

RCW 70A.65.120(1) (emphasis added). The act defines "cost burden" as "the impact on rates or charges to customers of electric utilities in Washington state for the incremental cost of electricity service to serve load due to the compliance cost for greenhouse gas emissions caused

---

[1] Electric utilities in Washington may be either consumer-owned (such as a municipal electric utility or a public utility district) or investor-owned (such as PacifiCorp). *See* RCW 19.405.020(10), (24).

by the program." RCW 70A.65.010(21). Electric utilities may transfer their no-cost allowances to power plants that they own. WAC 173-446-425.

Ecology's regulations implementing the CCA also explain that "[a]llowances will be allocated to qualifying electric utilities for the purposes of mitigating the cost burden of the program based on the cost burden effect of the program. *Only electric utilities subject to chapter 19.405 RCW, the Washington Clean Energy Transformation Act*, qualify for no cost allowances." WAC 173-446-230(1) (emphasis added). Ecology calculates the allocation of no-cost allowances to electric utilities using supply and demand forecasts provided by the utilities that "best predict the manner in which each electric utility will comply with the Clean Energy Transformation Act." WAC 173-446-230(2)(a)–(c). No-cost allowances to electric utilities phase out over time and must end by 2045—the same year that CETA requires all electric utilities to use "nonemitting electric generation and electricity from renewable resources" to "supply one hundred percent of all sales of electricity to Washington retail electric customers." RCW 19.405.050; *see* RCW 70A.65.120(2)(d) ("Under no circumstances may utilities receive any free allowances after 2045."); RCW 19.405.010(2) ("It is the policy of the state to . . . transition the state's electricity supply to . . . one hundred percent carbon-free by 2045.").

In practice, this means that the CCA provides electric utilities with no-cost allowances for the portion of their emissions that they forecast will be used to generate electricity sold to retail customers within Washington state. *See* Dkt. 11 ¶ 33; WAC 173-446-230. Electric utilities do not receive no-cost allowances for emissions associated with exported electricity because that electricity is not subject to CETA. *See Invenergy Thermal LLC v. Watson*, No. 3:22-cv-05967-BHS, 2023 WL 8404048, at *3 (W.D. Wash. Nov. 3, 2023) (describing how the CCA and CETA "work in tandem" by providing no-cost allowances under the CCA to electric utilities subject to CETA's decarbonization requirements).

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING DEFENDANT'S MOTION TO DISMISS - 6

1

2

**C.      PacifiCorp's Chehalis Facility**

3

PacifiCorp is an Oregon corporation with its principal place of business in Oregon.

4

Dkt. 11 ¶ 14. It does business as Rocky Mountain Power in Wyoming, Utah, and Idaho, and as

5

Pacific Power in Oregon, California, and Washington. *Id.* In all six states, it is a "regulated

6

public utility." *Id.* In Washington, where it has about 140,000 customers, PacifiCorp is regulated

7

by Ecology and the Washington Utilities and Transportation Commission. Dkt. 11 ¶ 2. As an

8

electric utility in Washington, PacifiCorp is subject to CETA for the electricity it sells "to

9

Washington retail electric customers." RCW 19.405.040(1), .050(1).

10

PacifiCorp owns and operates the Chehalis Generation Facility ("Chehalis"), a "gas-fired

11

combined cycle electric generation facility" in Lewis County, Washington that "has a nominal

12

generating capacity of 520 megawatts." Dkt. 11 ¶¶ 2–3. The amount of emissions generated by

13

Chehalis means that PacifiCorp must obtain allowances for those emissions under the CCA. *See*

14

Dkt. 11 ¶¶ 5, 8, 11, 35, 39.

15

PacifiCorp alleges that about 77 percent of its Chehalis emissions are used to generate

16

power for non-Washington customers, and that therefore it "will be required to spend tens of

17

millions of dollars on CCA allowances to account for greenhouse gas emissions from Chehalis."

18

Dkt. 11 ¶¶ 11, 39. PacifiCorp specifically alleges that it estimates 2024 CCA compliance costs of

19

$47.9 million, although this does not account for the no-cost allowances PacifiCorp will receive

20

for its Washington customers, which will reduce the cost. *Id.* ¶ 35.

21

PacifiCorp acknowledges in its complaint that while it intends to pass those costs along to

22

its non-Washington customers, because PacifiCorp is a regulated public utility in each state,

23

including those costs within its electric rates must be approved by each state's utility

24

commissions. *See* Dkt. 11 ¶¶ 8, 10, 14, 40–41. PacifiCorp alleges that so far, Wyoming and

Oregon's utility commissions have denied its requests to pass along those costs, meaning they

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING
DEFENDANT'S MOTION TO DISMISS - 7

1  will "be borne by PacifiCorp and its shareholders." *Id.* ¶¶ 10, 40–41.

2  **D.     Procedural History**

3          On December 15, 2023, PacifiCorp filed its complaint for declaratory and injunctive

4  relief, claiming that Ecology's allocation of no-cost allowances only for Washington customers

5  unconstitutionally discriminates against PacifiCorp and its non-Washington customers. Dkt. 1.

6  PacifiCorp amended its complaint on January 4, 2024. Dkt. 11. PacifiCorp alleges that Ecology's

7  implementation of the CCA violates the dormant Commerce Clause "by increasing the cost of

8  electricity for PacifiCorp's out-of-state customers, compared to PacifiCorp's Washington

9  customers, for electricity produced by the same generation facility" at Chehalis. *Id.* ¶ 12.

10         PacifiCorp moved for a preliminary injunction on January 11, and the parties agreed to a

11  combined briefing schedule on PacifiCorp's motion and Ecology's motion to dismiss. Dkt. 17,

12  20. On March 8, Ecology opposed PacifiCorp's motion and moved to dismiss the case. Dkt. 23.

13  Both parties have since completed their briefing and the Court heard oral argument. Dkt. 26, 30,

14  32. The motions are ripe for consideration.

15                                   **III.     DISCUSSION**

16  **A.     Legal Standard for Motion to Dismiss**

17         Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint for

18  lack of a cognizable legal theory or the "absence of sufficient facts alleged to support a

19  cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041

20  (9th Cir. 2010) (citation omitted). On a Rule 12(b)(6) motion, the Court "must accept as true all

21  factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving

22  party," *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th

23  Cir. 2014), but will test the legal sufficiency of the claims made in the complaint. *See Navarro v.*

24  *Block*, 250 F.3d 729, 732 (9th Cir. 2001). When granting a motion to dismiss, a district court

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING
DEFENDANT'S MOTION TO DISMISS - 8

should generally provide leave to amend unless it is clear the complaint could not be saved by any amendment. *See* Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

In this case, PacifiCorp alleges that the CCA violates the dormant Commerce Clause by discriminating between emissions generated to serve Washington and out-of-state utility customers. Although both parties submitted evidence on PacifiCorp's preliminary injunction motion, in ruling on Ecology's motion to dismiss the Court has considered only the law, the non-conclusory factual allegations in PacifiCorp's complaint, and administrative proceedings before the Washington Utilities and Transportation Commission subject to judicial notice. *Ritchie*, 342 F.3d at 908 (describing what materials may be considered on a motion to dismiss).

As explained further below, PacifiCorp's complaint must be dismissed because PacifiCorp cannot make out a cognizable dormant Commerce Clause theory. Even taking all of PacifiCorp's alleged facts as true, the CCA's different treatment of PacifiCorp's in-state and exported energy does not violate the Commerce Clause because the two categories are not "substantially similar." *Tracy*, 519 U.S. at 298. The energy PacifiCorp produces for use in-state is subject to a preexisting, comprehensive regulatory regime—the Clean Energy Transformation Act—that its exported energy is not. Throughout PacifiCorp's complaint and description of how no-cost allowances under the CCA are allocated, there is not one mention of CETA's existence, despite the CCA and its implementing regulations making clear that an electric utility is only eligible for no-cost allowances to the extent that it is subject to CETA's requirements. But the existence of CETA, and its role in the allocation of no-cost allowances, is not an inconvenient fact that PacifiCorp can avoid by artful pleading. It is part of the statutory framework that this Court must analyze when considering PacifiCorp's theory of the case. And when that framework

1    is examined as a whole, PacifiCorp's theory fails as a matter of law, requiring dismissal with

2    prejudice.

3    **B.      PacifiCorp has Article III standing.**

4           The Court has original jurisdiction over PacifiCorp's dormant Commerce Clause claim

5    under 28 U.S.C. § 1331. But Ecology challenges this Court's jurisdiction by arguing that

6    PacifiCorp lacks Article III standing. Dkt. 23 at 18–23. This argument is unpersuasive and

7    overcomplicates the standing inquiry.

8           Article III of the U.S. Constitution limits the Court's jurisdiction to "Cases" and

9    "Controversies." U.S. Const. art. III, § 2. For a case or controversy to exist, the party bringing

10   the case must have standing. *Perry v. Newsom*, 18 F.4th 622, 630 (9th Cir. 2021). The

11   "irreducible constitutional minimum" of Article III standing requires the plaintiff to show the

12   following three elements: "(1) [The plaintiff] suffered an injury in fact, (2) that is fairly traceable

13   to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable

14   judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016). As the party invoking the Court's

15   jurisdiction, the plaintiff "bears the burden of establishing these elements." *Id.*

16          Injury in fact is the "[f]irst and foremost" of the three elements. *Id.* "To establish injury in

17   fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that

18   is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at

19   339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A concrete injury is one that

20   is "real, and not abstract." *Spokeo*, 578 U.S. at 340 (internal quotation marks omitted). "An

21   injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury

22   to one's constitutional rights, to take just a few common examples." *FDA v. All. for Hippocratic

23   Med.*, 602 U.S. 367, 381 (2024). "A 'particularized injury' is one that 'affect[s] the plaintiff in a

24   personal and individual way.'" *Safer Chems., Healthy Fams. v. U.S. Env't Prot. Agency*, 943

F.3d 397, 411 (9th Cir. 2019) (quoting *Spokeo*, 578 U.S. at 339).

Second, to be fairly traceable to the challenged conduct, "there must be a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. The connection "must not be too speculative or attenuated." *All. for Hippocratic Med.*, 602 U.S. at 383. And third, to be redressable, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks omitted).

> 1.      *The CCA's requirement that PacifiCorp buy emissions allowances establishes standing for PacifiCorp's claims.*

Ecology asserts that PacifiCorp lacks standing to bring its dormant Commerce Clause claim because it has not presented an injury sufficiently connected to its constitutional claim. Dkt. 23 at 19. Ecology argues that PacifiCorp only asserts its non-Washington customers are injured to the benefit of Washington customers. *Id.* at 20. Ecology asserts that this injury is not plausibly alleged because PacifiCorp has not been allowed to increase its rates in other states to account for increased CCA compliance costs (*id.*; *see also* Dkt. 18-4 at 1; Dkt. 18-5 ¶ 211) and its non-Washington customers have therefore not suffered any injury.

Ecology argues that PacifiCorp cannot raise constitutional claims on behalf of "an unharmed group of third parties" and lacks the close relationship required to assert third-party standing. Dkt. 23 at 20–21 (citing *Coal. of Clergy, Lawyers, and Professors v. Bush*, 310 F.3d 1153, 1163 (9th Cir. 2002)). Ecology also argues that because PacifiCorp's regulatory applications to incorporate the cost of allowances into non-Washington utility rates remain under appeal, it is unclear "who will ultimately bear the cost of PacifiCorp's compliance with the CCA," and there is not yet a "realistic danger of sustaining a direct injury." Dkt. 23 at 22–23 (citing *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1149 (9th Cir. 2000)).

Ecology's position misstates the nature of PacifiCorp's injury and overcomplicates the

standing inquiry. "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish." *All. for Hippocratic Med.*, 602 U.S. at 382. The CCA requires PacifiCorp to obtain allowances for its Chehalis emissions, either through purchase at auction or the award of no-cost allowances. RCW 70A.65.060, .100–.130. PacifiCorp has plausibly alleged that it will have to spend money to purchase allowances for the emissions generated for exported electricity. Dkt. 11 ¶¶ 11, 35, 39.

Even if PacifiCorp might eventually be allowed to pass those costs on to its customers, PacifiCorp remains the regulated entity required to obtain the allowances in the first place. This is a sufficiently concrete and particularized injury for PacifiCorp to challenge the CCA's method of deciding when an electric utility must buy allowances rather than receive them for free. PacifiCorp's standing is based on its own injury, not a potential future injury of its customers. The alleged injury is caused by the requirements of the challenged statute and it could be redressed by an injunction requiring Ecology to distribute no-cost allowances for exported electricity or exempting PacifiCorp from the purchase of allowances altogether. *Kirola v. City & County of San Francisco*, 860 F.3d 1164, 1176 (9th Cir. 2017) (a claim is redressable if a federal court is capable of granting relief).

The Supreme Court reached a similar conclusion when faced with a standing challenge to a dormant Commerce Clause case in *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984). In *Bacchus*, the plaintiffs challenged an exemption from Hawaii's liquor tax granted to certain locally produced liquors to "encourage development of the Hawaiian liquor industry." *Id*. at 265. The state's tax agency argued that the plaintiffs, who were liquor wholesalers, lacked standing because they passed the tax along to their retailer customers and thus showed no economic injury from the tax. *Id.* at 266–67. The Court rejected this argument, holding that the wholesalers

"plainly have standing" because they are "liable for the tax," and "although they may pass it on to their customers . . . they must return the tax to the State whether or not their customers pay their bills." *Id.* at 267. In PacifiCorp's case, it must obtain the emissions allowances to comply with the CCA, whether it successfully passes the costs along or not, and it therefore has standing to challenge Ecology's method for allocating those allowances.

> 2.   *PacifiCorp's claim of injury is sufficiently ripe.*

Ecology also argues that PacifiCorp's claims are unripe "because the question of who will ultimately be required to pay for its CCA compliance costs is the subject of ongoing and future proceedings." Dkt. 23 at 21. For the same reasons PacifiCorp has standing, PacifiCorp's responsibility to bear the cost of CCA allowances—regardless of the results of its administrative appeals to pass on those costs to its customers—rebuts Ecology's ripeness argument. Dkt. 23 at 22–23. Ripeness is synonymous with the "injury-in-fact prong of the standing inquiry," *Smith v. Health Care Serv. Corp.*, No. 23-35508, 2024 WL 1927610, at *1 (9th Cir. May 2, 2024), for which there must be a "realistic danger of sustaining a direct injury," *Thomas*, 220 F.3d at 1149. PacifiCorp's obligation to at least front the cost of allowances is identifiable and imminent. Its claims are ripe.

## C.   **PacifiCorp does not make a cognizable dormant Commerce Clause claim.**

While PacifiCorp has standing to pursue its dormant Commerce Clause claims, the claims fail on their merits.

> 1.   *Federal courts must exercise caution before using the dormant Commerce Clause to strike down state laws regulating health and welfare.*

The Commerce Clause empowers Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. "Reading between the Constitution's lines," the Supreme Court has long held that "the

Commerce Clause not only vests Congress with the power to regulate interstate trade; the Clause also contains a further, negative command" that forbids enforcement "of certain state economic regulations even when Congress has failed to legislate on the subject." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (cleaned up). Courts refer to "[t]his 'negative' aspect of the Commerce Clause" as the "dormant Commerce Clause." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 515 (2019) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)).

Because the dormant Commerce Clause is a judicially created doctrine implied from the intent of the Commerce Clause rather than found in its text, the Supreme Court has focused on the purpose of the doctrine to interpret its limits. The "fundamental objective" of the dormant Commerce Clause is to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Tracy*, 519 U.S. at 287. Accordingly, the dormant Commerce Clause prohibits statutes and regulatory measures driven by protectionism, "designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers*, 598 U.S. at 369.

At the same time, dormant Commerce Clause jurisprudence "has had to respect a cross-purpose as well, for the Framers' distrust of economic Balkanization was limited by their federalism favoring a degree of local autonomy." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008). "The essence of our federal system is that within the realm of the authority left open to them under the Constitution, the States must be equally free to engage in any activity that their citizens choose for the common weal." *Id.* (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (1985)). And "[i]n our interconnected national marketplace, many (maybe most) state laws have the practical effect of controlling extraterritorial behavior." *Nat'l Pork Producers*, 598 U.S. at 374 (internal quotation marks omitted). "State income tax laws lead

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING DEFENDANT'S MOTION TO DISMISS - 14

some individuals and companies to relocate to other jurisdictions. Environmental laws often prove decisive when businesses choose where to manufacture their goods." *Id.* (internal citations omitted).

This respect for federalism and the traditional authority of the States to regulate health and welfare within their borders means that "'extreme caution' is warranted before a court deploys" the "implied authority" of the dormant Commerce Clause. *Id.* at 390 (quoting *Tracy*, 519 U.S. at 310). "Preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" *Id.* (quoting *Conway v. Taylor's Ex'r*, 1 Black 603, 634 (1862)). Courts must not use "the dormant Commerce Clause as 'a roving license for federal courts to decide what activities are appropriate for state and local government to undertake.'" *Id.* at 380 (quoting *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007)).

> 2. *The CCA's differing treatment of in-state and exported electricity does not violate the dormant Commerce Clause because the two categories are not similarly situated.*

A "threshold" question in considering a dormant Commerce Clause challenge is that "any notion of discrimination assumes a comparison of substantially similar entities." *Tracy*, 519 U.S. at 298–99; *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010) ("Differential treatment must be as between persons or entities who are similarly situated."). Ecology argues that "because of CETA, Washington retail power is differently situated than wholesale and out-of-state retail power." Dkt. 23 at 27. This argument disposes of PacifiCorp's claims.

As described above, *see supra* Sections II.A–B, when the Washington legislature enacted the CCA, it was not writing on a blank slate. Because CETA already existed, the legislature faced a situation where a certain class of emitters otherwise subject to the CCA—electric utilities

serving Washington residents—were already regulated by a separate and more aggressive decarbonization mandate. *Compare* RCW 19.405.030(1)(a) (eliminate coal power by 2025); .040(1) (eliminate natural gas power by 2030); .050(1) (total decarbonization by 2045) *with* RCW 70A.65.070; RCW 70A.45.020(1)(a) (reduce emissions to 45% of 1990 levels by 2030, 70% by 2040, and 95% by 2050). Rather than subject those utilities—including PacifiCorp—to overlapping sets of requirements, and potentially subject Washington's electric customers to unnecessary increased costs beyond what they already face under CETA, the legislature chose to issue no-cost CCA allowances to electric utilities to the extent that their emissions were already covered by CETA's decarbonization schedule.

Although one would not learn it from reading PacifiCorp's complaint—which does not mention CETA at all, and instead frames the no-cost allowances as simply a giveaway to Washington customers—the connection between no-cost allowances for electric utilities and CETA's preexisting regulatory regime is in the plain text of the CCA and its regulations. *See, e.g.*, RCW 70A.65.120(1) (granting no-cost allowances to electric utilities "subject to the requirements of . . . the Washington clean energy transformation act"); WAC 173-446-230(1) ("Only electric utilities subject to chapter 19.405 RCW, the Washington Clean Energy Transformation Act, qualify for no cost allowances."). The CCA's purpose of working in tandem with CETA's requirements, rather than just benefiting in-state customers, is reinforced by the statute phasing out the no-cost allowances by 2045, the same year that CETA's decarbonization mandate will be in full effect. RCW 70A.65.120(2)(d) ("Under no circumstances may utilities receive any free allowances after 2045.").

All of this aligns with a common-sense understanding of how the statutes work together. The CCA requires covered entities to buy allowances for carbon emissions, subject to a cap on allowances that decreases each year, so that market pressure will encourage those entities to

decarbonize. But electric utilities serving Washington customers don't need that market pressure because CETA already requires them to decarbonize, and on a faster schedule. In contrast, the emissions that PacifiCorp generates within Washington's borders at its Chehalis plant, but uses to export electricity to customers in other states, are not covered by CETA at all. This fundamental difference in preexisting regulation means that the two categories of emissions are not "substantially similar" for purposes of the dormant Commerce Clause. *Tracy*, 519 U.S. at 298.

Chief Judge G. Murray Snow of the U.S. District Court for the District of Arizona recently reached a similar result in *Day v. Henry*, 686 F. Supp. 3d 887 (D. Ariz. 2023). In *Day*, a group of wine collectors sued state regulators over Arizona's three-tiered alcohol regulation system. *Id.* at 890. Under that system, licensed liquor retailers could ship wine directly to consumers who made online orders, but unlicensed retailers could not. *See id.* Because obtaining a retail license required a physical presence in Arizona, the plaintiffs argued that the regulatory scheme discriminated against out-of-state liquor retailers in violation of the dormant Commerce Clause. *Id.* at 891.

In holding that the retailers were not similarly situated, Chief Judge Snow observed that "[r]etailers with physical premises in Arizona are subject to Arizona's specific three-tier system and regulations," including "on-site liquor inspections, investigation of complaints, covert underage buyer programs, audits and other financial inspections, and investigation of records to determine compliance with Arizona liquor laws." *Id.* at 895. They were also required, unlike the unlicensed out-of-state retailers, "to obtain alcohol from Arizona wholesalers or wholesalers under Arizona's oversight and regulation." *Id.* The court concluded that "[i]t is doubtful that retailers subject to all of Arizona's liquor regulations and retailers subject to none of them can be seen as similarly situated." *Id.* at 895–96.

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING DEFENDANT'S MOTION TO DISMISS - 17

Chief Judge Snow also noted, as several other courts have also recognized, that "when granting plaintiffs' requested relief would allow the out-of-state entity 'dramatically greater rights' than the in-state entity, they are likely not similarly situated." *Id.* at 896 (quoting *Wine Country Gift Baskets.com v. Steen*, 612 F.3d 809, 820 (5th Cir. 2010)); *cf. Lebmoff Enterprises Inc. v. Whitmer*, 956 F.3d 863, 873 (6th Cir. 2020) ("[Licensed] retailers all live with the bitter and sweet of Michigan's three-tier system . . . [Plaintiff] seizes the sweet and wants to take a pass on the bitter.") PacifiCorp's argument faces the same problem. Granting PacifiCorp its requested relief would mean that the emissions it generates in Chehalis, but uses to export electricity, would be exempt from both CETA's decarbonization mandate and the CCA's requirement of purchasing emissions allowances. This would elevate the energy used to serve the out-of-state interest above Washington's entire program of reducing carbon emissions, reinforcing that the two categories are not similarly situated.

That PacifiCorp's energy produced at Chehalis for in-state versus exported electricity is subject to a different regulatory scheme also distinguishes this case from the two Supreme Court cases that PacifiCorp primarily relies on: *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564 (1997), and *Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 100 (1994). In *Camps Newfound*, in which the Court struck down a statute that limited property tax exemptions for charities to those serving mostly in-state residents, the Supreme Court explained that "there is no question that the statute at issue here is facially discriminatory because it disparately treats *identically situated* Maine nonprofit camps depending upon whether they favor in-state, as opposed to out-of-state, campers." 520 U.S. at 583 (emphasis added). PacifiCorp cannot plausibly allege that the energy it produces in Washington subject to CETA is "identically situated" to the energy that is not. In *Oregon Waste Systems*, the Supreme Court struck down a statute that imposed different fees on the disposal of solid waste generated in- and

out-of-state. 511 U.S. at 95. But the Supreme Court expressly recognized in that case that "[n]o claim has been made that the disposal of waste from other States imposes higher costs on Oregon and its political subdivisions than the disposal of in-state waste." *Id.* at 101. In other words, the state of Oregon had not argued that the two streams of waste were not similarly situated, let alone subject to different regulatory regimes.

PacifiCorp also argues that if Ecology wants to rely on the application of CETA to distinguish in-state and exported electricity, it must do so under the "compensatory tax" doctrine considered in the *Oregon Waste Systems* case, not the threshold question of whether the two categories are substantially similar. *See* Dkt. 26 at 24–25. PacifiCorp's argument is not persuasive. The compensatory tax doctrine is "a specific way of justifying a facially discriminatory tax as achieving a legitimate local purpose that cannot be achieved through nondiscriminatory means." *Oregon Waste Sys.*, 511 U.S. at 102. "Under that doctrine, a facially discriminatory tax that imposes on interstate commerce the rough equivalent of an identifiable and 'substantially similar' tax on intrastate commerce does not offend the negative commerce clause." *Id.* at 102–03. "The tax on interstate commerce must be shown roughly to approximate—but not exceed—the amount of the tax on intrastate commerce." *Id.* at 103. But the CCA's allocation of no-cost allowances to utilities already subject to CETA's requirements is not the equivalent of a "facially discriminatory tax." Instead, the threshold analysis used in *Day v. Henry* and other cases in which the competing entities were subject to different regulatory regimes is the relevant inquiry.

Finally, the conclusion that the CCA's differing treatment of energy used for in-state versus exported electricity does not violate the dormant Commerce Clause is reinforced by the reality that the provision of electricity to retail customers is not the type of competitive national market that the dormant Commerce Clause traditionally endeavors to protect. As PacifiCorp

acknowledges in its complaint, it "is a regulated public utility" in all six of the states that it

serves, and the costs that it recovers from retail customers are determined by each state's utility

commission. Dkt. 11 ¶¶ 14, 40–42; *see also F.E.R.C. v. Elec. Power Supply Ass'n*, 577 U.S. 260,

265 (2016) (explaining that while the Federal Power Act authorizes FERC to regulate the

competitive interstate market for wholesale electricity, it "leaves to the States alone, the

regulation of 'any other sale'—most notably, any retail sale—of electricity" (quoting 16 U.S.C.

§ 824(b))). In Washington, for example, the Utilities and Transportation Commission must

"[r]egulate in the public interest . . . the rates, services, facilities, and practices of all persons

engaging within this state in the business of supplying any utility service." RCW 80.01.040(3).

In doing so, the Commission must set "just, fair, reasonable and sufficient" rates,

RCW 80.28.010, and "assure that regulated utilities earn enough to stay in business." *PacifiCorp

v. Wash. Util. & Transp. Comm'n*, 194 Wn. App. 571, 588, 376 P.3d 389 (2016) (quotation

marks and citations omitted).

What this means in practice is that the CCA's regulation of the cost of emitting carbon

from Chehalis does not have the type of direct impact on out-of-state customers that, for

example, the Maine statute in *Camps Newfound* had on increasing summer camp prices for out-

of-state campers, or the surcharge in *Oregon Waste Systems* had on out-of-state waste disposers,

because each state's utility commission regulates the rates charged to its own residents.[2] In this

sense, the retail electric market in the United States is already the type of "Balkanized" system

that the dormant Commerce Clause in competitive markets serves to guard against—a fact

acknowledged by both the Federal Power Act and the Supreme Court's Commerce Clause cases.

*See, e.g.*, *Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 395 (1983) ("[T]he

---

[2] For the same reason, Ecology's argument is also stronger than Arizona's in *Day v. Henry*,
where the in-state and out-of-state liquor retailers could genuinely compete for online customers.

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING
DEFENDANT'S MOTION TO DISMISS - 20

national fabric does not seem to have been seriously disturbed by leaving regulation of retail utility rates largely to the States."); *Elec. Power Supply Ass'n v. Star*, 904 F.3d 518, 525 (7th Cir. 2018) ("The commerce power belongs to Congress; the Supreme Court treats silence by Congress as preventing discriminatory state legislation. Yet Congress has not been silent about electricity: it provided in [the Federal Power Act] that states may regulate local generation." (citing 16 U.S.C. § 824(b)).

Under this system, PacifiCorp's retail electricity customers in Washington and other states do not compete in the way that typically triggers dormant Commerce Clause scrutiny. If PacifiCorp succeeds in passing the compliance costs of the CCA on to its out-of-state customers, it will be because each state's utility commission has approved charging its own residents those rates. And if PacifiCorp fails, then its shareholders will incur those costs not because they serve out-of-state customers, but because they own and operate a power plant in Washington state that produces emissions not already covered by CETA's decarbonization schedule—just like any other comparable covered entity under the CCA. *Cf. Elec. Power Supply Ass'n*, 904 F.3d at 525 ("Illinois has not engaged in any discrimination beyond what is required by the rule that a state must regulate within its borders. All carbon-emitting plants in Illinois need to buy credits.").

"The dormant Commerce Clause protects markets and participants in markets, not taxpayers as such." *Tracy*, 519 U.S. at 300. The nature of the state-controlled market for retail electricity, and "the absence of actual or prospective competition between" in- and out-of-state retail electric customers, *see id.*, reinforces the conclusion that the CCA's differing treatment of energy produced at Chehalis for in-state versus exported electricity does not offend the Commerce Clause.

       3.    *The CCA does not violate the dormant Commerce Clause under the* Pike *test.*

PacifiCorp's complaint also alleges that even if the CCA's allocation of no-cost

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING DEFENDANT'S MOTION TO DISMISS - 21

allowances is considered nondiscriminatory, it "nonetheless contravenes the Commerce Clause" under the analysis derived from *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Dkt. 11 ¶ 60. This claim also fails as a matter of law.

In *National Pork Producers*, the Supreme Court clarified the application of *Pike*, rejecting an argument that courts must "at least assess the burden imposed on interstate commerce by a state law and prevent its enforcement if the law's burdens are clearly excessive in relation to the putative local benefits." 598 U.S. at 377 (internal quotation marks omitted). The Court explained that this reading "overstate[s] the extent to which *Pike* and its progeny depart from the antidiscrimination rule that lies at the core of our dormant Commerce Clause jurisprudence." *Id.* Instead, *Pike* generally stands for the principle that "a law's practical effects may also disclose the presence of a discriminatory purpose." *Id.*; *see also id.* at 391 (Sotomayor, J., concurring) ("*Pike*'s balancing and tailoring principles are most frequently deployed to detect the presence or absence of latent economic protectionism."). While the Court "left the courtroom door open to challenges premised on even nondiscriminatory burdens," *id.* at 379 (internal quotation marks and citation omitted), it observed that such cases often "have addressed state laws that impose burdens on the arteries of commerce, on trucks, trains, and the like." *Id.* at 392 (Sotomayor, J., concurring) (internal quotation marks omitted). Anything else falls outside of "*Pike*'s core." *Id.*

PacifiCorp's argument cannot succeed under any application of *Pike* because it both falls outside of *Pike*'s core and, like the failed challenge in *National Pork Producers*, PacifiCorp has failed to plausibly "allege a substantial burden on interstate commerce." *See id.* at 393 (Sotomayor, J., concurring). The application of *Pike* does not reveal latent economic protectionism because, as discussed extensively above, emissions generated in Washington for in-state retail electricity (which are already subject to CETA's decarbonization mandate) are not

similarly situated to those generated for exported electricity (which are not). *Tracy*, 519 U.S. at 298 ("[A]ny notion of discrimination assumes a comparison of substantially similar entities.").

PacifiCorp has not alleged a substantial burden on interstate commerce because retail electric customers do not compete in a national marketplace, and any increased costs to PacifiCorp's out-of-state customers must be approved by their own state's regulatory commissions. *See id.* at 300 ("[I]n the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply."). If CCA compliance costs are ultimately borne by PacifiCorp's shareholders and make the use of the Chehalis plant less profitable, that is how carbon pricing works, and is not sufficient on its own to show a substantial burden on interstate commerce. *See Elec. Power Supply Ass'n*, 904 F.3d at 524 ("On this view, whenever Illinois, or any other state, takes some step that will increase or reduce the state's aggregate generation capacity, or affect the price of energy, then the state policy is invalid. That can't be right; it would be the end of federalism.").[3] The *Pike* balancing test cannot save PacifiCorp's claims.

    4.    *The CCA does not discriminate between electric utilities.*

Although PacifiCorp agreed at oral argument that its "primary claim is that [Ecology] is treating in-state and out-of-state customers differently," Dkt. 33 at 8:1–2, it has also suggested that the CCA discriminates against "out-of-state companies like PacifiCorp." *See* Dkt. 17 at 13, 28–29. There are no factual allegations in PacifiCorp's complaint that support this argument, and

---

[3] Although unnecessary for resolving this case, the Court notes that the Seventh Circuit in *Electric Power Supply Association* suggested that because Congress has expressly provided in the Federal Power Act that "states may regulate local generation," the *Pike* balancing test "does not apply to a state's regulation of electric capacity or a cross-subsidy between carbon-emitting generation and carbon-free generation." 904 F.3d at 525.

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING DEFENDANT'S MOTION TO DISMISS - 23

1   the plain text of the CCA treats all utilities equally. The provisions of the CCA challenged by

2   PacifiCorp apply equally to all utilities operating in Washington, regardless of their state of

3   incorporation or headquarters. *See* RCW 70A.65.010(38), .080(1)(b)–(c), .200. And the

4   allocation of no-cost allowances applies to "all consumer-owned and investor-owned electric

5   utilities subject to" CETA. RCW 70A.65.120(1). Indeed, this District has previously determined

6   that the CCA treats all electric utilities the same when allocating no-cost allowances. *Invenergy*

7   *Thermal LLC v. Watson*, No. 3:22-cv-05967-BHS, 2023 WL 8404048, at *12 (W.D. Wash. Nov.

8   3, 2023) ("In sum, regardless of whether an electric utility is owned by an in-state entity or an

9   out-of-state entity, the CCA treats that utility the same as any other electric utility: it is entitled to

10  no-cost allowances.").

11              *5.      PacifiCorp's statutory interpretation argument fails.*

12          "In the alternative" to its claim under 42 U.S.C. § 1983 that the CCA violates the

13  dormant Commerce Clause, Count Two of PacifiCorp's complaint alleges that Ecology's

14  regulations allocating the CCA's no-cost allowances based only on Washington retail electricity

15  load have misinterpreted the statute. Dkt. 11 ¶¶ 67–74. Although PacifiCorp appeared to

16  abandon this claim at oral argument, *see* Dkt. 33 at 4:7–6:12, Ecology correctly points out that if

17  PacifiCorp wanted to bring a freestanding challenge to whether Ecology's implementing rules

18  are consistent with the CCA, it needed to do so under Washington's Administrative Procedure

19  Act. *Hillis v. Wash. Dep't of Ecology*, 131 Wn.2d 373, 381, 932 P.2d 139 (1997) (with limited

20  exceptions "the Administrative Procedure Act (APA) provides the exclusive means of judicial

21  review of agency action"); RCW 34.05.510 ("This chapter establishes the exclusive means of

22  judicial review of agency action"); RCW 34.05.570(2) (setting out procedure for challenging

23  agency rules under APA). Even if this may be considered under the doctrine of constitutional

24  avoidance (as PacifiCorp asserted at oral argument, *see* Dkt. 33 at 5:22–6:4), the plain text of the

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING
DEFENDANT'S MOTION TO DISMISS - 24

CCA ties no-cost allowances for electric utilities to the requirements of CETA, which apply only to Washington customers. RCW 70A.65.120(1). However PacifiCorp intended it, this argument fails as a matter of law.

## IV.    CONCLUSION

As the Supreme Court cautioned just last year, "[p]reventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" *Nat'l Pork Producers*, 598 U.S. at 390. PacifiCorp's claims fall far short of that mark. Defendant Watson's motion to dismiss is GRANTED and PacifiCorp's complaint is DISMISSED.

PacifiCorp has not requested leave to amend its complaint. But even if it had, because this Court's ruling is based on the plain text of the CCA and CETA and the way the statutes interact, rather than on insufficient factual allegations, the deficiencies in PacifiCorp's complaint cannot possibly be cured by the allegation of other facts and leave to amend would be futile. *See* Fed. R. Civ. P. 15(a); *Manzarek*, 519 F.3d at 1031. The case is therefore DISMISSED WITH PREJUDICE. PacifiCorp's Motion for Preliminary Injunction (Dkt. 17) is denied as moot. The Clerk is directed to enter judgment in favor of Defendant and close the case.

Dated this 15th day of July, 2024.

Tiffany M. Cartwright
United States District Judge